FILED
CLERK

10:21 am, Jan 31, 2022

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------X

ANDREW GAYOT,

                Petitioner,

        -against-

STATE OF NEW YORK,

                Respondent.

--------------------------------------------------------------X

<u>For Online Publication Only</u>

**<u>MEMORANDUM AND ORDER</u>**
19-CV-4657 (JMA)

**APPEARANCES:**

Andrew Gayot
      *Petitioner Pro Se*

Rosalind C. Gray, Assistant District Attorney
Suffolk County District Attorney's Office
200 Center Drive
Riverhead, NY 11901
      *Attorney for Respondent*

**AZRACK, United States District Judge:**

On June 21, 2016, following a bench trial in state court, Andrew Gayot ("Gayot") was convicted of the following:

- four counts of Sex Trafficking

- one count of Compelling Prostitution

- three counts of Promoting Prostitution in the Second Degree

- two counts of Promoting Prostitution in the Third Degree

- two counts of Strangulation in the Second Degree

- two counts of Criminal Obstruction of Breathing

- two counts of Rape in the Third Degree

- two counts of Criminal Sexual Act in the First Degree

- two counts of Criminal Sexual Act in the Third Degree

- two counts of Endangering the Welfare of a Child

- four counts of Criminal Possession of a Controlled Substance[1]

- one count of Criminally Using Drug Paraphernalia

- one count of Assault in the Second Degree

- one count of Assault in the Third Degree

- three counts of Petit Larceny

- and two counts of Criminal Possession of a Weapon in the Third Degree.

On July 27, 2016, Gayot was sentenced to an aggregate of thirty years imprisonment and twenty-five years of post-release supervision.[2]

---

[1] Gayot was convicted of one count of Criminal Possession of a Controlled Substance ("CPCS") in the Third Degree, one count of CPCS in the Fourth Degree, and two counts of CPCS in the Seventh Degree.

[2] Gayot was sentenced to: (i) an indeterminate sentence of twelve-and-a half to twenty-five years imprisonment on each of the Sex Trafficking counts; (ii) an indeterminate sentence of four and-a-half years to nine years incarceration on the Compelling Prostitution count; (iii) an indeterminate sentence of seven and-a-half to fifteen years imprisonment on each of the Promoting Prostitution in the Second Degree counts; (iv) an indeterminate sentence of three and-a-half to seven years imprisonment on each of the Promoting Prostitution in the Third Degree counts; (v) a determinate sentence of five years imprisonment and five years post-release supervision on each of the Strangulation in the Second Degree counts; (vi) a determinate sentence of one year imprisonment on each of the Criminal Obstruction of Breathing counts; (vii) a determinate sentence of four years imprisonment and twelve years post-release supervision on each of the Rape in the Third Degree counts; (viii) a determinate sentence of twelve years imprisonment and twenty years post-release supervision on each of the Criminal Sexual Act in the First Degree counts; (ix) a determinate sentence of four years imprisonment and twelve years post-release supervision on each of the Criminal Sexual Act in the Third Degree counts; (x) a determinate sentence of one year imprisonment on each of the Endangering the Welfare of a Child counts; (xi) a determinate sentence of five years imprisonment and three years post-release supervision on the Criminal Possession of a Controlled Substance in the Third Degree count; (xii) a determinate sentence of three years imprisonment and three years post-release supervision on the Criminal Possession of a Controlled Substance in the Fourth Degree count; (xiii) a determinate sentence of five years imprisonment and three years post-release supervision on the Criminal Possession of a Controlled Substance in the Third Degree count; (xiv) a determinate sentence of one year on each of the Criminal Possession of a Controlled Substance in the Seventh Degree counts; (xv) a determinate sentence of one year imprisonment on the Criminally Using Drug Paraphernalia count; (xvi) a determinate sentence of seven years imprisonment and five years post-release supervision on the Assault in the Second Degree count; (xvii) a determinate sentence of one year imprisonment on the Assault in the Third Degree count; (xviii) a determinate sentence of one year on each of the Petit Larceny counts; (xix) a determinate sentence of three and-a-half years imprisonment and seven years post-release supervision on one count of Criminal Possession of a Weapon in the Third Degree; and (xx) a determinate sentence of two years imprisonment and four years post-release supervision on one count of Criminal Possession of a Weapon in the Third Degree. All sentences and periods of imprisonment run concurrently, with the exception of the determinate sentence of seven years imprisonment and five years post-release

Gayot, appearing *pro se*, petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, raising various grounds for relief.  For the following reasons, all of Gayot's proffered grounds are procedurally barred or without merit.  Therefore, the petition is DENIED in its entirety.

The following facts are taken from the petition and the state court record.[3]

## A. <u>Background</u>

### 1. **Gayot's Prostitution Ring and Abuse of the Three Prostitutes Who Testified**

The evidence at trial demonstrated that Gayot operated a prostitution ring out of his residences in Lindenhurst, New York, first from 212 3rd Avenue and, later, 258 N. Greene Avenue. As part of his sex trafficking operation, Gayot abused three women, NN, GM, and NS.[4]  Gayot targeted women from troubled backgrounds with substance abuse issues and used drugs, threats, and violence to ensure the women stayed at his residence and surrendered all their earnings to him. Gayot also engaged in sexual relations with each of the women, including NS who was a minor.

Gayot first met NN in January 2013 shortly after she was released from Seafield, a drug treatment program.  (May 18 Tr. 43.)  NN was introduced to Gayot by both a friend she met at Seafield and a high school acquaintance named Brandon Fortune.  (May 18 Tr. 43-44, 46-47.) NN's parents were heroin addicts, and as children NN and her brother were eventually removed from their custody.  (May 18 Tr. 45.)  While NN was in nursing school, she became addicted to

---

supervision on the Assault in the Second Degree count, which runs consecutively to all other counts, for an aggregate sentence of thirty years imprisonment and twenty-five years post-release supervision. (S. at 21.)

[3] "Hr'g Tr." refers to the <u>Huntley</u>/<u>Wade</u>/<u>Dunaway</u> hearing held on December 15, 2015 and December 22, 2015.  The trial of <u>People v. Gayot</u> took place on May 12, 2016, May 18-19, 2016, May 23-25, 2016, May 31-June 3, 2016, June 6-10, 2016, June 13, 2016, and June 15-16, 2016, of which each date is a separately numbered transcript of trial minutes.  As such, each transcript will be referenced herein by "Tr." preceded by the date.  "S." refers to the transcript for the sentencing proceedings, <u>People v. Gayot</u> S. Tr., July 27, 2016.

[4] In light of the August 7, 2020 Order granting Respondent's request to file under seal, the victims shall be referred to only by their initials.

pills which led to her eventually using heroin.  (May 18 Tr. 44.)  At the time NN enrolled at Seafield, she was using heroin, cocaine, Xanax, Percocet, and Vicodin.  (May 18 Tr. 44.)

NN arranged to meet her friend at a CVS parking lot, and when she arrived to pick up NN, Gayot was driving.  (May 18 Tr. 46-47.)  NN was reluctant to get into the car, but because she saw her friend and Fortune were passengers, she got into the car.  (May 18 Tr. 47.)  The group picked up heroin from a local drug dealer, then drove to the Lindenhurst train station to get high.  (May 18 Tr. 48-49.)  NN later stayed overnight with Fortune.  (May 18 Tr. 49.)

The next day, Gayot returned to pick up Fortune and NN, and they went to Gayot's home at 212 3rd Street in Lindenhurst.  (May 18 Tr. 49.)  After spending a couple of nights at Gayot's home, NN started living with him after he bought her clothes.  (May 18 Tr. 51.)  Gayot introduced the idea of prostitution slowly, telling NN that she shouldn't give away sex for free and it was easy money.  (May 18 Tr. 51-52.)  Fortune had given NN a similar speech when she stayed with him, and NN told both Fortune and Gayot that she wasn't willing to engage in prostitution, but she would help them recruit other prostitutes.  (Tr. 52.)  Eventually NN gave in and began prostituting in January or February of 2013.  (Tr. 57-58.)  She was not allowed to keep the money that she made and gave any earnings to Gayot, but in exchange for prostituting, Gayot provided NN with clothes, a place to live, and drugs, namely heroin and cocaine.  (Tr. 52-53.)

At one point, Gayot put NN—who looked like "crap" at the time and "wasn't making as much money"—into rehab for five days at the Nassau Medical Center.[5]

After NN began prostituting, Gayot groomed NN and taught her how to run a prostitution ring.  (May 18 Tr. 54-55.)  Gayot taught her to put up ads, take phone calls, how to collect money, and how to recruit other prostitutes.  (Tr. 54-55, 91-92.)  After NN had been prostituting for a few

---

[5]  Defense counsel argued this was inconsistent with Gayot being a pimp and giving the women drugs to impair their judgment so that they would prostitute themselves.  (May 19 Tr. 78–82; June 16 Tr. at 24.)

months, Gayot told her that if she recruited other prostitutes, NN would not have to prostitute anymore and would help him control the operation. (Tr. 90.) In May 2013, NN was at the First District Court in Central Islip posting bail money for Gayot when she met GM. (Tr. 91.) GM approached NN and Gayot's friend Robert Hosey in the parking lot to ask for a cigarette. (Tr. 91-92.) NN asked questions seeking information that Gayot had taught her to seek out in a recruit, and learned that GM was just released from jail, was previously a stripper, and was on suboxone, which indicated she was addicted to drugs. (Tr. 92.) NN and GM exchanged numbers, and NN happily informed Gayot that she met a potential recruit. (Tr. 92.)

GM later agreed to hang out with NN and Gayot, and they picked up GM and brought her to Gayot's apartment at 212 3rd Avenue, Lindenhurst. (May 18 Tr. 92-93.) Both NN and Gayot spoke to GM about prostituting, but GM was not interested. (June 7 Tr. 27-29.) However, after GM stayed the night at his apartment, he would not let GM leave. (June 7 Tr. 30-31.) Gayot also took GM's cell phone and refused to return it. (June 7 Tr. 22.) Later, GM had to seek medical treatment for an infected cut on her finger and Gayot and NN drove her to and from the hospital to get treated. (June 7 Tr. 36-37.) Gayot also paid for the pain medication she was prescribed. (June 7 Tr. 37.) After staying at Gayot's apartment for about a week, GM ran out of her suboxone prescription and began to experience severe withdrawal symptoms. (June 7 Tr. 38-39.) Gayot would not allow GM to refill her suboxone prescription, and instead gave her heroin and pills. (June 7 Tr. 39-40.) Gayot told GM that she would have to pay him back for the pain medication and drugs by prostituting for him, and GM acquiesced while under the influence of drugs. (June 7 Tr. 37-38, 42-44.)

NS met Gayot in November 2013. (June 1 Tr. 89.) At that time, NS was fifteen years old and a runaway. (June 1 Tr. 81-82.) NS was on family court probation for stealing her mother's

jewelry, and, as a condition of probation, NS wore a GPS bracelet.  (June 1 Tr. 81-82.)  In October 2013, NS ran away from home, removed the bracelet, and was staying with her boyfriend until police located her there.  (June 1 Tr. 82-83.)  After leaving her boyfriend's home, NS met up with two friends.  (June 1 Tr. 85.)  One of NS's friends reached out to Brandon Fortune on Facebook and arranged for him pick them up.  (June 1 Tr. 86.)  Fortune and Gayot picked up NS and her friends and brought them to Gayot's apartment at 258 North Greene Avenue.[6]  (June 1 Tr. 87-88.)

Back at Gayot's apartment, Gayot, Fortune, NN, and NS and her friends, drank did cocaine, and smoked marijuana.  (June 1 Tr. 93-94.)  NS told Gayot she was only 15.  (June 1 Tr. 96.)  Gayot and NN asked NS about her family life, then slowly introduced the idea of prostituting by telling NS that she could have a family with them, a lot of money, and live a fantastic life.  (June 1 Tr. 95-96.)  NS was offended at first, but then Gayot told her she was perfect and beautiful and that he was only interested in her, and not her friends.  (June 1 Tr. 97-99.)  NS agreed to prostitute for Gayot.  (June 1 Tr. 102.)

After convincing NN, GM, and NS to prostitute for him, Gayot advertised their services on Backpage.com.  (May 18 Tr. 55.)  Gayot made NN, GM, and NS each pose for photographs in underwear, then had those photos posted on the Backpage website under different names, including "Stella," "Gina," Dani D," and "Ryyder."  (May 18 Tr. 99-100.)  When NN first started working for Gayot, he showed NN how to post on Backpage, and gave her instructions to regularly post advertisements using his Bethpage Federal Credit Union credit card.  (May 18 Tr. 101.)  The Backpage ads also stated that women were "party friendly" meaning that the prostitute would

---

[6] Gayot moved from his apartment at 212 3rd Avenue, Lindenhurst to 258 N. Greene Avenue, Lindenhurst in approximately early summer of 2013.  (May 19 Tr. 32.)  Gayot and NN moved in with Brandon Fortune and his mother, Kathy Fortune.  (May 19 Tr. 32-33.)  Kathy Fortune later moved out of the apartment in November 2013. (June 13 Tr. 8-9.)

engage in drug use with the client, called "johns," or supply cocaine for the john.  Gayot would only sell cocaine to johns that were regulars or that he knew well.  (May 18 Tr. 75-76.)

Once johns responded to a Backpage ad, NN took the calls under her fake name, asked what the customer was looking for, and gave prices.  (May 18 Tr. 73.)  Gayot charged johns $200.00 for a half hour, and $300.00 for a full hour, regardless of the sex act, unless it was anal sex or a fetish, in which case there was an additional charge.  The women only did "out calls," meaning that they met johns at their homes or at a motel, but Gayot did not allow calls past Patchogue and Mastic.  (May 18 Tr. 68.)

The women were not allowed to keep the money they earned from each job, called a "punch."  Instead, they gave all the money to Gayot and he provided them with drugs, typically heroin and cocaine, before and after each punch.  (June 7 Tr. 59-60.)  Gayot would not give the women drugs during the day, even if they were experiencing withdrawal, because it did not benefit him.  (June 7 Tr. 57, 62.)  If the women earned more than one thousand dollars, Gayot gave them more heroin or cocaine as a reward.  (June 7 Tr. 61.)

Gayot used violence, or threats of violence, to control the women.  He searched the women or acted violently towards them if he believed they were withholding money.  On one occasion, a john only paid NS $160 instead of $200, and Gayot believed that NS stole the rest of the money. (June 2 Tr. 30-31.)  Gayot jumped on top of NS and used both hands to strangle her while telling her "not to mess with his money."  (June 2 Tr. 31.)  NS couldn't breathe and Gayot left bruises on her neck.  (June 2 Tr. 31.)  On other occasions, Gayot punched NS in the face, choked her, and forced her to engage in sexual intercourse with him.  (June 2 Tr. 45, 56-58.)  NS was afraid to say no to Gayot's sexual advances because she wanted to stay on his good side.  (June 2 Tr. 60.)  NS

had just turned fifteen years old before the first time Gayot forced her to engage in sexual intercourse.  (June 2 Tr. 52.)

Gayot also punished GM by choking her, pulling her hair, and, on one occasion, "whacked" her head against a car window.  (June 7 Tr. 56.)  Gayot threatened GM that if she tried to leave or was disrespectful, he would hurt her family.  (June 7 Tr. 105.)  GM was also punished by being forced to engage in sexual activity with Gayot, mainly by performing oral sex on him.  (June 7 Tr. 56.)  In one instance, Gayot held a taser in his hand and threatened to tase GM is she did not perform oral sex on him.  (June 7 Tr. 85-86.)  Gayot also forced GM to engage in anal sex with him causing her to bleed.  (June 7 Tr. 89-90.)  Later, GM begged Gayot to leave the house, and he agreed and GM started to pack.  (June 7 Tr. 112.)  GM called Hosey to come pick her up, at which time Gayot accused her of having sex with Hosey and pushed her against a wall and choked her until she passed out.  (June 7 Tr. 113.)  GM woke up in a closet and escaped the next day.  (June 7 Tr. 113, 115, 122.)

Gayot used NN's love for him to manipulate and control her.  NN wanted to be his favorite and considered him her boyfriend. Gayot promised NN that if she recruited other prostitutes she wouldn't have to work anymore and could help run things, however he never followed through on that promise.  (May 18 Tr. 57.)  On February 23, 2014, NN came home from a punch and Gayot found needles in her pocket.  (May 20 Tr. 19.)  Gayot stripped NN down to her underwear, punched her in the face, and the next thing she remembered was waking up in a cold shower.  (May 20 Tr. 19.)  NS was also home and saw Gayot on top of NN tasing her and hitting her with an extension cord.  (June 2 Tr. 79-80.)  Gayot made NN kneel against a wall while he continued to tase her and hit her with the cord, meanwhile NN was unable to scream and NS could smell burning flesh.  (June 2 Tr. 81-82.)  NS estimated Gayot tased NN over one hundred times before throwing her

down the stairs.  (June 2 Tr. 82-83.)  Gayot then started hitting NS and punched her in the face causing her to bleed to the point where she was choking on her own blood.  (June 2 Tr. 84-85.)  Later, NS went to check on NN and observed that NN looked like she had been "run over by a bus" and that it hurt her to cry.  (June 2 Tr. 86.)  The next morning the house still smelled like burned flesh.  (June 2 Tr. 88.)  As discussed infra, photographs were taken of NN's injuries at a hospital two days after the beating.[7]

### 2.  The February 25 Search and Gayot's Arrest

Two days after Gayot's assault on NN, on February 25, 2014 at approximately 6:00 a.m., a probation search order was executed at Gayot's home, located at 258 North Greene Avenue.  (June 3 Tr. 57.)  The search order authorized a search of the residence and any vehicles or outbuildings on the property.  (May 31 Tr. 230.)  Fortune, who also resided at the house, was a suspected gang member and on probation for prior convictions, including criminal possession of a weapon in the fourth degree.  (June 3 Tr. 58; June 6 Tr. 58; Order Directing Search, D.E. 13-13, at ECF p. 33.)  Fortune's probation officer, Joseph Martorell, had performed a home visit prior to the probation search order, and, based on his observations during that home visit, including the presence of a gun cleaning kit and a lot of people coming in and out of the house, Officer Martorell suspected that Fortune possessed a firearm and was dealing drugs in violation of the terms of his

---

[7] While Gayot did not testify at trial, it is notable that in his habeas reply submission, he claims that he was involved with NN, knew she was an escort, and was trying to help her overcome her drug addiction.  (D.E. 16.)  According to Gayot, on February 23, NN appeared disheveled and bruised,  After he found a hypodermic needle on her, she admitted purchasing drugs.  (Id. at 6–7.)  According to the fantastical account in Gayot's submission, in order to deter her from continuing to use drugs he told her that she would have to accept ten lashes from an electrical extension cord as punishment for her deceit.  (Id.)  He also claims that he then threatened her with the stun gun to scare her, but never used the stun gun on her.  (Id.)  While Gayot did not testify to this account at trial, Gayot did make a statement to Detective Scott Aquilino after his arrest in which he admitted that he had "caught [NN] with needles the other day and we got into it," but claimed that "it only happened one time."  (June 10 Tr. 45.)

probation.[8]  (June 6 Tr. 26-28.)  The probation search order authorized the probation officers and

law enforcement executing the order to search the entire house because Fortune had access to the

rooms in the house.[9]  (June 6 Tr. 38; Order Directing Search, D.E. 13-13, at ECF p. 33.)  Gayot,

NN, NS, Fortune, and Rahmel Allen (who also resided in the house) were present when the home

---

[8] As discussed further herein, the underlying affidavit for the probation search order is not part of the state court record. However, the brief submitted by the state on direct appeal discussed the supporting affidavit that Officer Martorell provided to obtain the probation order and represented that:

> Prior to the execution of the search order, Probation Officer Martorell completed an affidavit in which he described how he developed information that the probationer (Fortune) possessed at least one handgun.  He conducted a home visit at Fortune's residence where he discovered that the probationer possessed, was using, and possibly packaging drugs.  Martorell also found fixed blades and a firearm cleaning kit.  Fortune told Martorell that he had access to most areas of the residence.

> Probation Officer Martorell also learned from law enforcement that 258 N. Greene Ave. was a location where drug activity occurred and a resident of the home had recently been arrested for the possession of narcotics.  The facts articulated in his affidavit provided Martorell with reasonable cause to believe that Fortune was violating the conditions of his probation by possessing illegal drugs and possibly a firearm.

(Resp. App. Br., D.E. 13-8 at 88.)  The state's opposition to Gayot's § 440.10 motion also represented the contents of this supporting affidavit.  (D.E. 13-12 at 32.)  These representations were part of the record before the state courts and, as such, may be considered by this Court.

[9] An unsigned copy of probation search order, which is part of the part of the state court record, provides, in pertinent part:

> With proof by affidavit, having been this day made before me by Probation Officer Jose A Martorell, that there is reasonable cause to believe that the probationer [Brandon Fortune] has violated the said conditions by possessing illegal drugs and illegal weapons.

> It is hereby ordered that Probation Officer Martorell, along with his agent, is authorized to search the person of said defendant, Brandon C. Fortune, and the entire premises in which he resides at 258 N Greene Ave, Lindenhurst, NY 11757, including any vehicles and outbuildings on the premises, and any real or personal property which he owns or which is in his possession for illegal drugs and illegal weapons.

> Further, a no-knock endorsement is hereby authorized.

(Order Directing Search, D.E. 13-13, at ECF p. 33.)  The state court record does not include Officer Martorell's affidavit or the signed version of the probation order.  However, the state's opposition to Gayot's omnibus suppression motion and its submissions on both direct appeal and in opposition to the § 440.10 motion represented that the search order was signed by a judge and the latter two filings also represented the contents of the supporting affidavit.  All of these representations were part of the record before the state courts and, as such, may be considered by this Court.  As discussed infra, Gayot filed, in the instant habeas proceedings, a motion to compel production of the affidavit and signed search order, which the Court denied.  (See n. 17 infra.)

was searched.  (June 3 Tr. 60; May 23 Tr. at 148.)  Allen was also on probation at the time of the search.  (June 1 Tr. 20.)

When the probation search order was executed, the home was first secured by members of the Emergency Services unit and all of the occupants—including Gayot, Fortune, NN, NS, and Allen—were placed in handcuffs and gathered together in the dining room.  (Jan. 5, 2016 Hr'g Dec., D.E. 13-17 at ECF p. 60; May 31 Tr. 22–23; June 3 Tr. 62; June 6 Tr. 4-5.)  Detective Marcus Rivera, a member of the Suffolk County Police Department and the FBI gang task force, was assigned to search the first floor bedroom.  (June 3 Tr. 63-64.)  After the house was secured, Detective Rivera entered and saw Gayot and NN in Gayot's room.  (June 3 Tr. 61–64; June 6 tr. 62.)  Probation Officer Martorell, along with three other probation officers, also participated in the search of the home, including Gayot's bedroom.  (June 3 Tr. 58, 63, 65, 90.)  Martorell was also a member of the gang task force.  (June 6 Tr. 20.)

During the search, Detective Rivera recognized NS from her missing persons flyer.  (June 6 Tr. 3.)  When all the occupants were gathered together in a common room during the search, Detective Rivera observed that NS was very quiet, thin, and dirty.  (June 6 Tr. 4-5.)  Probation Officer Nichols commented that NS looked like a girl missing from Lindenhurst who was on a missing person poster in his office.  (May 31 Tr. 235-36.)  Officer Nichols asked NS for her name, and she responded her name was GM, and gave Officer Nichol's GM's photo identification.  (May 31 Tr. 240.)  Officer Nichols compared the photo and knew that she was not GM.  (May 31 Tr. 241.)

During the search, Detective Marcus Rivera recovered numerous cell phones, a stun gun, a can of mace, a bullet proof vest carrier, and velcro patches with the word "police" on them from Gayot's bedroom.  (June 3 Tr. 63-64.)  With respect to the stun gun—which was recovered from

11

an unsealed cardboard box in the bedroom closet—Gayot told Detective Rivera "that's mine." (June 3 Tr. 70–72; June 6 Tr. 65.)  A bullet proof vest and vest carrier were also found in the closet. (June 3 Tr. 95–100, 103.) Detective Rivera also recovered ammunition, credit cards, a digital scale with cocaine residue, a marijuana grinder, plastic baggies, and a blackberry from the TV stand area in Gayot's bedroom.  (June 3 Tr. 64-65, 105–06, 128; June 6 Tr. 47 (noting there were baskets in the TV stand).)  A lockbox was also recovered from the dining room, which contained pills, capsules, cocaine, keys, a handcuff key, razor blades, plastic baggies, and a cigar.  (June 3 Tr. 64-65, 73–85.)  Additionally, a .45 caliber handgun was recovered from a red BMW parked in the driveway.  (June 3 Tr. 140.)  The vehicle was registered to NN, but was previously registered to Gayot.  (June 3 Tr. 146.)

After the lockbox was pried open and the items in the lock box were recovered, Gayot spontaneously stated "all the drugs are mine, everything in the box is mine.  All they got is a drug possession charge on me, I'll be back home in a couple of days, you're looking in the wrong places."  (June 3 Tr. 74, 78, 85-86.)  During the search, Gayot tried to stop the other occupants from talking, telling them not to say anything and that everything would be all right.  (June 6 Tr. at 5–6.)

At the precinct, officers interviewed the occupants of the house.  (June 9 Tr. 132.) Detective Richard Sneider interviewed NS, who told him about a "prostitution thing going on." (June 9 Tr. 133.)  NS told the detectives about what had happened during the three months she had been involved with Gayot and gave a written statement.  (June 2 Tr. 92; June 3 Tr. 6, 38 (indicating on cross-examination that she told the officers that "[o]ther times he had hit me and given me nosebleeds and choked me until I almost passed out.").  Detective Sneider also interviewed NN, who seemed anxious and afraid.  (June 9 Tr. 134.)  NN was afraid to cooperate and told police that

Gayot was the devil and law enforcement couldn't protect her.  (May 24 Tr. 64; June 9 Tr. 134-35.)  Detective Thomas Corso, who observed that NN was very thin and had red marks and bruising on her neck, later transported her to Stony Brook Hospital.  (May 31 Tr. 95–104.)  At the hospital, Corso observed that NN had brutal whip marks and stun-gun marks all over her body.  (May 31 Tr. 99-104.)  At the hospital, NN allowed photographs to be taken of her injuries.  (May 20 Tr. at 25–38.)  NN refused a rape exam and did not tell the nurse or doctor what had occurred because she loved Gayot and did not want to get him into trouble.  (May 20 Tr. 25.)

Gayot was arrested on February 25, 2014 during the probation search on charges of possession of noxious material, criminal possession of a controlled substance, criminal use of drug paraphernalia, and criminal possession of a weapon.  (Dec. 15 Hr'g Tr. 34.)  At the precinct, Defendant admitted, again, that he had said that the drugs were his and told the police that he gave the drugs to NN because was she addicted and "so she wouldn't take too much."  (June 6 Tr. at 9.)  Following Gayot's arrest, search warrants were issued on February 25, 2015 and March 17, 2014 and executed at 258 North Greene Street based on witness interviews and additional investigation.  During the execution of those search warrants, additional items were recovered including another stun gun, a computer, two electrical cords, and some bedding.  (June 10 Tr. 49.)

### 3. Pre-Trial Proceedings and Gayot's Conviction After a Bench Trial

After his arrest, and through the trial proceedings, Gayot was represented by three separate defense counsel.  Gayot was first represented by attorney Larry Flowers, whose representation began on March 13, 2014.  (See Not. of App. Flowers, D.E. 13-6, at ECF pp. 3-4.)  During his representation, attorney Flowers made motions on Gayot's behalf.  On March 18, 2014, Flowers moved to inspect and dismiss the indictment and also requested discovery from the prosecution.

(See Mot. to Dismiss, D.E. 13-6, at ECF pp. 21-84, Discovery Demand and Bill of Particulars, D.E. 13-17, at ECF pp. 9-23.)

Flowers also filed, on November 11, 2014, an omnibus motion seeking Mapp, Huntley, Dunaway, and Wade hearings and sought suppression of physical evidence.  (See Omni. Mot., D.E. 13-15, at ECF pp. 65-75, D.E.13-16, at ECF pp. 1-63 cont'd.)  The omnibus motion sought, inter alia, to controvert the validity of the search warrants and to suppress evidence obtained as a result of defendant's allegedly unlawful arrest.[10]  The prosecution submitted opposition papers on February 3, 2015, asserting, inter alia, that Gayot's arrest was "the result of the execution of lawfully-obtained probation search order conducted by the Suffolk County Probation Department with the assistance of the Suffolk County Police Department on the home of Brandon Fortune, an individual with whom Defendant was residing at 258 North Greene Avenue . . . at the time of his arrest."  (D.E. 13-10 at ECF p. 22–23.)  The prosecution provided an unsigned copy of the probation search order and indicated, "upon information and belief," that the copy of the order signed by District Court Judge Jennifer Henry is on file with the Clerk's Office in Central Islip."[11] (Id. at 11–12.)

On March 4, 2015, Judge Fernando M. Camacho issued an order granting Gayot Dunaway/Huntley and Wade hearings.  (Omni. Dec. Mar. 4, 2015, D.E. 13-5 at ECF pp. 40-44.) The order also granted a Mapp hearing to the "determine the admissibility of any physical property

---

[10] Defense counsel Flowers was served with copies of the signed search warrants on October 7, 2014.  (Oct. 7, 2014 Disc. Letter, D.E. 13-13, at ECF pp. 66-71.

[11]  The prosecution's submission also indicated that the prosecution had "made a request for a copy of the signed order with the probation officer assigned to the case and will turn over a copy of such to the Court upon receipt."  (Id.)  The prosecution's motion papers also stated that—for both the probation search order and the search warrants—if "the Court need[ed] the originals and the accompany[ing] documents, including all applications and affidavits, sealed or otherwise, and the sealed statements and criminal histories of confidential informants, where applicable, said documents are on file at the Clerk's Office (with the sealed items under seal until further Order from the issuing Court)."  (Id. at 18.)

recovered from the defendant subsequent to his arrest that was not recovered pursuant to a search warrant." (Omni. Dec. Mar. 4, 2015, at ECF p. 40.) The court's order stated that "the discovery of the Taser-type stun gun, drug paraphernalia and narcotics in defendant's room and within the lock-box, pursuant to a legally executed Department of Probation Search Order, and to which defendant spontaneously admitted ownership, provided the necessary probable cause to effectuate his arrest." (D.E. 13-10, at ECF p. 51.) The court also denied suppression of the evidence obtained during the execution of the search warrants. (Omni. Dec. Mar. 4, 2015 at ECF pp. 40-42.)

On March 12, 2015, Flowers was relieved and attorney Christopher Brocato was assigned. (See Not. of App. Brocato, D.E. 13-6, at ECF pp. 107-08.) Brocato began his representation by appearing for Gayot's arraignment on a new indictment, which added additional charges. Brocato proceeded to argue against the prosecution's ultimately successful attempt to consolidate the indictments. Brocato also requested discovery on Gayot's behalf and represented him at pre-trial hearings.

On December 15, 2015, a pre-trial hearing took place to address the Huntley, Wade, Dunaway issues concerning Gayot's February 25, 2014 arrest, and Mapp issues relating to evidence seized subsequent to Gayot's arrest that was not seized pursuant to a search warrant. (Dec 15 Hr'g Tr. 2-3.) This hearing was held before Judge Barbara Kahn, who also presided over Gayot's subsequent bench trial. At the outset of the hearing, the prosecution represented that, in fact, there was no evidence recovered subsequent to Gayot's arrest that had not been seized pursuant to a search warrant. (Dec 15 Hr'g Tr. 3.) The prosecution further stated that any physical evidence recovered outside of the search warrants was recovered pursuant to the probation search order executed the day of Gayot's arrest on February 25, 2014. (Dec 15 Hr'g Tr. 4-5.)

During the hearing, Brocato disagreed with the prosecution's understanding of the hearing parameters, stating that there was physical evidence recovered that was not sought in the search warrants, and he argued that he should be permitted to inquire about those items.  (Dec 15 Hr'g Tr. 4.)  Brocato argued that the search warrants sought evidence of a prostitution ring, and the items recovered at issue were those not typically associated with prostitution, including narcotics, a stun gun, and a handgun.  (Dec 15 Hr'g Tr. 4-5.)  The prosecution countered that the items listed were seized during the probation search, which was never controverted during motion practice.  (Dec 15 Hr'g Tr. 5.)  Judge Kahn court denied. "at this time." Brocato's application to inquire about the additional items that had been seized.  (Dec 15 Hr'g Tr. 5-6.)

During cross examination of Detective Rivera at the hearing, defense counsel nevertheless asked numerous questions regarding the probation search order and Fortune's suspected possession of a weapon.  (Dec 15 Hr'g Tr. 39-48.)  During one exchange, Brocato elicited from Detective Rivera that he had a "belief and suspicion" that Fortune and Gayot "could be working together in an unlawful manner."  (Dec. 15 Hr'g Tr. 48.)  At one point, Brocato argued to the court that Gayot had "an expectation of privacy in his bedroom, not in the whole house but in his bedroom."  (Dec 15 Hr'g Tr. 50–51.)  However, the prosecution objected to Brocato's questioning and inquiry into these issues.  During a sidebar, Judge Kahn did not permit defense counsel to continue with the line of questioning because the probation search order had never been controverted and Judge Kahn found that it was "long past the time when it would have been appropriate to do so."  (Dec 15 Hr'g Tr. 50.)

Judge Kahn ultimately issued a written decision on January 5, 2016 denying suppression.  (Jan. 5, 2016 Hr'g Dec., D.E. 13-17 at ECF pp. 58-67.)  Judge Kahn's order stated, inter alia, that "the discovery of the Taser-type stun gun, drug paraphernalia and narcotics in defendant's room

and within the lock-box, pursuant to a legally executed Department of Probation Search Order, and to which defendant spontaneously admitted ownership, provided the necessary probable cause to effectuate his arrest." (Hr'g Dec., D.E. 13-17, at ECF p. 62.)

On April 26, 2016, Brocato was relieved and defense attorney Daniel Russo was assigned to represent Gayot. (See Not. of App. Russo, D.E. 13-8, at ECF pp. 41-42.) On May 18, 2016, a Molinuex/Sandoval hearing was held prior to trial, during which Russo made an application for a motion to reargue and to conduct a Mapp hearing concerning the probation search order. (May 18 Tr. 12-13, 17-18.) Judge Kahn denied counsel's motion as there had never been a motion to controvert the probation search order. Judge Kahn had previously denied a hearing to litigate the probation search order and refused to revisit that determination. (May 18 Tr. 18-19.)

At Gayot's criminal trial, which was a bench trial before Judge Kahn, the prosecution presented evidence and testimony, including testimony from all three victims, NN, GM, and NS, as well as law enforcement and forensic witnesses. NN, GM, and NS each testified about meeting Gayot, how they began prostituting for him, and about the abuse they each suffered at his hands. They testified about how Gayot used drugs as a method to control them and that he sold drugs to certain johns. NN and NS testified about the brutal attack on February 23, 2014, and NN showed her scars at trial, as well as photographs of her fresh injuries that were taken at the hospital shortly after the probation search order was executed on the apartment.

In addition to the testimony of the three women, the prosecution introduced other corroborative evidence, including:

(1) the Backpage ads for the women that were paid for on Gayot's debit card, (May 19 Tr. 85-87.);

(2) Gayot's computer that was used to post the Backpage ads and to access his debit card account, (June 8 Tr. 43-45, 51-53);

17

(3) DNA evidence from the comforter in Gayot's room that confirmed his sexual encounters with NS, (June 9 Tr. 91-93);

(4) testimony from the nurse who examined NN at the hospital and a sex-trafficking expert witness, (see generally May 25 Tr. 86-167; May 27 Tr. 111-226;

(5) incriminating letters that Gayot sent to NN in prison, (May 19 Tr. 65-76); and

(6) testimony from a john who repeatedly hired NN and who provided damaging testimony about Gayot's involvement with NN including, inter alia, an occasion when the john observed Gayot driving NN to meet the john for a cocaine sale and another occasion where Gayot was present when the john paid NN $10,000 in the belief that he was buying her freedom from prostitution, (May 24 Tr. 182-185; May 25 Tr. 30-38).

At the close of the prosecution's case, defense counsel presented a case including testimony from: (1) Kathy Fortune, Brandon Fortune's mother and former resident of 258 N. Greene Street; (2) Langston Griffin, a friend of Gayot's; and (3) Larry Flowers, Gayot's first attorney.  In his defense, Kathy Fortune—who had moved out of the house in November 2013 but still continued to visit the house—testified that:  (1) she did not observe any evidence of criminality at 258 N. Greene Street; (2) her understanding of NN and Gayot's relationship were that they were boyfriend and girlfriend; and (3) that she did not observe any evidence of physical abuse to either NN or NS. (June 13 Tr. 11-14.)  Langston Griffin, who had only sporadically visited the house, testified that NN was Gayot's girlfriend and there was no evidence of physical abuse by Gayot against NN or NS.  (June 13 Tr. 37-39.)  On summation, Russo argued that the three women, NN, NS, and GM, were all drug addicts, liars, and thieves who could not be believed and prostituted and stole money to support their drug addictions.  (June 16 Tr. 3-6.)  NN, who was originally charged with felony and misdemeanor drug charges, pled guilty before Gayot's trial, testified pursuant to a cooperation agreement, and received immunity for prostitution-related offenses.  (May 18 Tr. at 39–40.)  Prior to trial, NN violated the terms of her plea agreement when she was arrested and then pled guilty to heroin possession.  (Id. at 41.)

At the close of all the evidence, there was a charge conference and both parties gave closing arguments.  On June 21, 2016, Gayot was found guilty of:

- four counts of Sex Trafficking

- one count of Compelling Prostitution

- three counts of Promoting Prostitution in the Second Degree

- two counts of Promoting Prostitution in the Third Degree

- two counts of Strangulation in the Second Degree

- two counts of Criminal Obstruction of Breathing

- two counts of Rape in the Third Degree

- two counts of Criminal Sexual Act in the First Degree

- two counts of Criminal Sexual Act in the Third Degree

- two counts of Endangering the Welfare of a Child

- four counts of Criminal Possession of a Controlled Substance[12]

- one count of Criminally Using Drug Paraphernalia

- one count of Assault in the Second Degree

- one count of Assault in the Third Degree

- three counts of Petit Larceny

- and two counts of Criminal Possession of a Weapon in the Third Degree.

Gayot was acquitted of fourteen counts.  On July 27, 2016, Gayot was sentenced to an aggregate of thirty years imprisonment and twenty-five years of post-release supervision.  (S. 18-21.)

---

[12] Gayot was convicted of one count of Criminal Possession of a Controlled Substance ("CPCS") in the Third Degree, one count of CPCS in the Fourth Degree, and two counts of CPCS in the Seventh Degree.

**B. <u>Post-Conviction Proceedings</u>**

**1. The Direct Appeal**

On September 18, 2017, Gayot appealed his conviction to the Second Department of the New York State Appellate Division.  On appeal, Gayot argued: (1) the court committed reversible error by refusing to allow defense counsel to inquire regarding the facts and circumstances under which incriminating evidence against him was obtained during the execution of a probation search order issued against Brandon Fortune; (2) his Fourth Amendment right to be free from unreasonable search and seizure was violated by the probation search order; and (3) he was denied effective assistance of counsel at multiple stages of the proceeding by all three separate counsel who represented him.  For the ineffective assistance claim, Gayot argued that: (i) Flowers failed to move to suppress evidence obtained pursuant to the probation search order; (ii) Brocato failed to advocate for further inquiry into the circumstances of the probation search order at the suppression hearing, thereby demonstrating that he was clearly not familiar with the facts surrounding the probation search order; and (iii) Russo failed to move to reopen the suppression hearing when additional factors were revealed at trial concerning the search of his residence prior to his arrest.  (See Def.'s App. Br., September 18, 2017 ("App. Div. Br."), at pp. 24-53, ECF No. 13-9.)  In connection with his ineffective assistance of counsel claims, Gayot sought a new trial, but did not request a hearing.  Finally, Gayot also argued that the sentence imposed was harsh and excessive.

In May 2018, the Second Department affirmed Gayot's conviction.  <u>People v. Gayot</u>, 164 A.D.3d 1259 (N.Y. App. Div. 2d Dep't 2018).  Regarding the Fourth Amendment claim involving the probation search order, the Appellate Division found that "the contention is unpreserved for appellate review because the defendant never moved for such suppression."  <u>Gayot</u>, 164 A.D.3d

at 1259.  The Second Department declined to review Gayot's Fourth Amendment claims related to the probation search order pursuant to its interest of justice jurisdiction.  Id.  With respect to the claims alleging ineffective assistance by each of the three defense counsel who represented Gayot throughout the proceedings, the Appellate Division found that the "record shows that defense counsel provided meaningful representation to the defendant, and, thus, he was not deprived of the effective assistance of counsel."  Id. (internal citations omitted).  The Appellate Division further found that the sentences imposed were not excessive.  Id.

On November 15, 2018, the New York State Court of Appeals denied Gayot's request for leave to appeal.  People v. Gayot, 32 N.Y.3d 1111 (N.Y. 2018).

**2.  Motion to Vacate Judgment**

On February 6, 2018 Gayot filed a *pro se* § 440.10 motion, wherein he argued that (i) he received ineffective assistance of trial counsel; (ii) the prosecution failed to disclose Brady material; (iii) new evidence demonstrates the prosecution withheld or misrepresented the circumstances of Gorete Goncalves' arrest; (iv) the prosecution withheld Rosario material relating to Detective Rivera and former police chief James Burke.  (See Mot. to Vacate J., February 6, 2018, ECF No. 13-11, at ECF pp. 37-52.)  With respect to his ineffective assistance of counsel claim, Gayot argued, inter alia, that: (1) all three defense counsel failed to recognize that the probation search order violated his constitutional rights to privacy in his home; and (2)  all three defense counsel failed to compel production of the probation warrant or move for suppression.  Mot. to Vacate J., at ECF p. 38.)  Gayot requested, in summary fashion, a hearing on all his claims.

On July 23, 2018, the trial court denied the § 440.10 motion in its entirety.  (Dec. and Order, July 23, 2018, ECF No. 13-11, at ECF pp. 8-12.)  The trial court denied Gayot's ineffective assistance of counsel claim, finding that defendant's arguments were without merit.  (Dec. and

Order, July 23, 2018 at ECF p. 9.)  The trial court found that Flowers served the prosecution "with a Demand for Discovery and filed numerous motions seeking suppression of evidence obtained during the search of the defendant's home and his subsequent arrest."  (Dec. and Order, July 23, 2018 at ECF p. 10.)  The court further noted that Flowers was successful in obtaining hearings to determine the admissibility of statements, identification, and physical evidence.  (Dec. and Order, July 23, 2018 at ECF p. 10.)  Regarding Brocato, the court found that counsel participated in the suppression hearing and "vigorously cross-examined witnesses and raised pertinent legal issues." The trial court found that Gayot received effective assistance of counsel during the pre-trial proceedings.  (Dec. and Order, July 23, 2018 at ECF p. 10.)  The trial court also found that Russo provided effective assistance, stressing that Gayot failed to articulate how Russo's pre-trial investigation was deficient.  (Dec. and Order, July 23, 2018 at ECF p. 10.)

On February 22, 2019, the Appellate Division denied Gayot's application for leave to appeal the trial court's § 440.10 decision.  People v. Gayot, 2019 N.Y. Slip Op. 63887(U) 2019 WL 908161 (N.Y. App. Div. 2d Dep't 2018).

### 3. The Instant Petition

Gayot filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on August 12, 2019, asserting two grounds for relief: (1) defense counsel's representation was ineffective; and (2) he was denied his Fourth Amendment right to be free from unreasonable search and seizure.  For the reasons discussed below, all of Gayot's claims are without merit.  Thus, the instant petition is DENIED in its entirety.

## II. DISCUSSION

### A. <u>Standards of Review</u>

#### 1. Overview of AEDPA

Congress enacted the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104–132, 110 Stat. 1214 (1996), to restrict "the power of federal courts to grant writs of habeas corpus to state prisoners." <u>Williams v. Taylor</u>, 529 U.S. 362, 399 (2000) (O'Connor, J., concurring).  Under AEDPA, a prisoner may file a habeas petition "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  To make that showing, the petitioner must demonstrate: (1) the exhaustion of state remedies, (2) the absence of a procedural bar, and (3) the satisfaction of AEDPA's deferential review of state court decisions.  <u>See</u> <u>id.</u> § 2254.

#### 2. AEDPA Standard of Review

If a state court reached the merits of a claim, a federal court may not grant a writ of habeas corpus unless the state court's adjudication of the claim either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  The Supreme Court has construed AEDPA "to give independent meaning to 'contrary [to]' and 'unreasonable.'" <u>Jones v. Stinson</u>, 229 F.3d 112, 119 (2d Cir. 2000).

A state court's decision is "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." <u>Williams v. Taylor</u>, 529 U.S. 362, 412–13 (2000) (O'Connor, J.,

concurring).  A decision involves an "unreasonable application" of clearly established federal law when a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case."  Id. at 413.  This standard does not require that all reasonable jurists agree that the state court was wrong.  Id. at 409–10.  Rather, the standard "falls somewhere between 'merely erroneous and unreasonable to all reasonable jurists.'"  Jones, 229 F.3d at 119 (quoting Francis S. v. Stone, 221 F.3d 100, 109 (2d Cir. 2000)).

AEDPA "'imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt.'"  Jones v. Murphy, 694 F.3d 225, 234 (2d Cir. 2012) (quoting Hardy v. Cross, 132 S. Ct. 490, 491 (2011) (per curiam)).  This standard is "'difficult to meet,'" and for good reason.  White v. Woodall, 134 S. Ct. 1697, 1702 (2014) (quoting Metrish v. Lancaster, 133 S. Ct. 1781, 1786 (2013)), reh'g denied, 134 S. Ct. 2835 (2014).  A petitioner must show that the "state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Id. at 1702.

Furthermore, a state court's determinations of factual issues are "presumed to be correct," and the petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); see also Lynn v. Bliden, 443 F.3d 238, 246 (2d Cir. 2006).  A state court's findings of fact will be upheld "'unless objectively unreasonable in light of the evidence presented in the state court proceeding.'"  Lynn, 443 F.3d at 246–47 (quoting Miller-El v. Cockrell, 537 U.S. 322, 340 (2003)).  Thus, a federal court may overrule a state court's judgment only if "after the closest examination of the state-court judgment, a federal court is firmly convinced that a federal constitutional right has been violated."  Williams, 529 U.S. at 389.

B. <u>Claims for Relief</u>

As stated above, Gayot seek habeas relief on two separate grounds: (1) defense counsel's representation was ineffective; (2) he was denied his Fourth Amendment right to be free from unreasonable search and seizure. (<u>See</u> Pet. at p. 6-7.) For the following reasons, the petition is DENIED in its entirety.

### 1. Ineffective Assistance of Counsel Claim

Gayot claims that he was denied his right to effective representation by counsel by each of his three defense counsel. (Pet. at p. 6.) Gayot argues that: (1) Flowers failed to properly move to suppress evidence obtained as a result of the probation search order; (2) Brocato was not familiar with the facts surrounding the probation search order and failed to adequately advocate for further inquiry at the hearing; and (3) Russo failed to move to reopen the hearing when additional factors were revealed at trial. (Pet. at p. 6.) Gayot exhausted these claims and the state court rejected them on merits, subjecting them to AEDPA deference on habeas review. For the following reasons, this claim is denied.

As a general principle, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." <u>Strickland v. Washington</u>, 466 U.S. 668, 689 (1984). After all, "there are countless ways to provide effective assistance in any given case," and "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." <u>Id.</u> In reviewing the totality of the evidence, the Court must "use a 'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt." <u>Burt v. Titlow</u>, 134 S. Ct. 10, 13 (2013) (quoting <u>Cullen v. Pinholster</u>, 563 U.S. 170, 190 (2011)). Bearing in mind this deferential standard, it is no surprise that "the great majority of habeas petitions that allege constitutionally ineffective counsel" fail. <u>Lindstadt v. Keane</u>, 239 F.3d 191,

25

199 (2d Cir. 2001); see also Fischer v. Smith, 780 F.3d 556, 561 (2d Cir. 2015) (case where the Second Circuit denied an ineffective assistance claim based on failure to pursue a suppression motion based on Massiah even though the Circuit observed that "we would hope that most lawyers would spot the Massiah issue in this case" and that, "[i]deally, Smith's trial counsel would have made a motion raising the issue").

To establish deficient performance, a petitioner must prove that "counsel's representation fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688. But even if the petitioner can show deficient performance, he must also establish prejudice – that is, "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

On habeas review, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court." Harrington v. Richter, 562 U.S. 86, 101 (2011). To obtain habeas relief, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 562 U.S. at 103.

Here, on appellate review, the Second Department found that "[t]he record shows that defense counsel provided meaningful representation to the defendant, and, thus, he was not deprived of the effective assistance of counsel." Gayot, 164 A.D.3d at 1259. The trial court and Appellate Division similarly rejected the ineffective assistance claims in Gayot's § 440.10 motion.

26

Here, the state courts' application of <u>Strickland</u> was not unreasonable and "beyond any possibility for fairminded disagreement." <u>Harrington</u>, at 103.

> ### i. *Attorney Flowers*

Gayot argues that his first attorney, Larry Flowers, failed to properly move to suppress evidence obtained as a result of the probation search order executed at his home.[13]  (Pet. at 6.)  The Court disagrees.

In his petition, Gayot states "[c]ounsel #1 failed to properly allege grounds supported by a sworn affidavit of facts in support of his motion to suppress evidence obtained as a result of a probation search order executed at petitioner's home and resulted in his arrest on February 25, 2014, as required by C.P.L. § 710.60(1)."  (Pet. at 6.)  However, Gayot's petition fails to articulate the grounds on which counsel Flowers should have made his suppression motion.

In an abundance of caution, the Court looks to the arguments raised in Gayot's appellate brief and § 440.10 motion.  In his appellate brief, Gayot acknowledges that, in his omnibus motion, Flowers sought suppression of physical evidence.  However, Gayot argues that once Flowers learned, in the government's opposition papers, that the search was pursuant to a probation search order and the government was relying on the probation search order to justify the evidence seized the morning of February 25 and his arrest, he should have filed a reply affirmation seeking to controvert the probation search order and failed to do so.  (App. Div. Br. pp. 44-45.)  Gayot's appellate brief fails to articulate the grounds on which Flowers should have sought to controvert the probation search order.  In his § 440.10 motion, specifically in his affidavit, Gayot states that

---

[13] Gayot contended, in his state court filings, that Flowers was ineffective for not obtaining the probation search order from the prosecution prior to making the omnibus motion.  However, in the omnibus motion Flowers asked the Court to compel production of discovery and also requested that the prosecution be precluded from using materials that they had failed to turn over.  (See Omnibus Mtn., D.E. 13-16, at ECF pp. 4-5.)  In its omnibus decision, the court denied Flower's motion to preclude as premature.  (Omnibus Dec., D.E. 13-5 at ECF p. 40.)

Flower's motion to suppress the physical evidence was defective because it only included general conclusions and failed to properly state the grounds on which his motion was based.  (Mot. to Vacate J., at ECF pp. 26-28.)  Here, Gayot does not articulate on what grounds Flower's motion should have been based, except to argue that it should have been more specific with respect to the probation search order in that the search order did not give law enforcement the right to enter his home.  At other points in his appellate brief and § 440.10 motion, Gayot argued that he had a privacy interest in his bedroom and the lockbox.[14]  (See App. Div. Br. pp. 47-48.)  While it is not clear that Gayot ever clearly articulated to the state court what arguments or theories he contends Flowers should have advanced in his motion or at a subsequent hearing, the Court assumes that Gayot is contending that Flowers should have argued that the search was improper because he had a reasonable expectation of privacy interest in his bedroom and the lockbox recovered in a common area.

In the context of ineffective assistance of counsel claims for failure to file a motion to suppress evidence, a defendant must establish that:  (1) it was objectively unreasonable for defense counsel not to make the motion; and (2) there is a reasonable probability that the suppression motion would have been successful and that the outcome of the proceeding would have been different absent the excludable evidence.  See Fischer v. Smith, 780 F.3d 556, 561–62 (2d Cir.

---

[14] In both his Appellate Division brief and his 440.10 motion papers, Gayot generally asserted that:

> I had a Fourth Amendment privacy interest in being free from an unreasonable invasion and search of my home. The "probation search order" which only served to protect Brandon Fortune, the person named in the search order, from an unreasonable search and seizure, did nothing to protect my interest in the privacy of my house and the unjustified intrusion of the police. Therefore, even assuming that the "probation search order" was issued for a legitimate purpose, it was overly broad when it permitted a search of appellant's entire premises at 258 North Greene Avenue.

> (Gayot's Aff in Supp. of § 440.10 Mot. ¶ 17; App. Div. Br. at 37.)

2015); Mosby v. Senkowski, 470 F.3d 515, 519 (2d Cir. 2006); Watson v. Crowley, No. 07-CV-1111, 2011 WL 4639814, at *4 (S.D.N.Y. May 10, 2011), adopted by 2011 WL 4639812 (S.D.N.Y. Oct. 6, 2011).  When reviewing an ineffective assistance of counsel claim in the habeas context, establishing that a state court unreasonably applied the Strickland standard under § 2254(d) is very difficult.  "The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so."  Fischer, 780 F.3d at 561 (denying habeas petition alleging counsel was ineffective for failing to file a suppression motion) (internal quotations and citations omitted).  As such, this Court does not find the state court's finding "objectively unreasonable."  28 U.S.C.  § 2254(d)(1).

Under New York state law, a person under a sentence of probation is in the legal custody of the court that imposed probation until the term of probation expires or is terminated.  C.P.L. § 410.50(1).  As such, if at any time the court has "reasonable cause to believe" that the probationer has violated the terms of probation, the court may issue a search order that may authorize a probation officer to search the "premises in which he resides."  C.P.L. § 410.50(3).  New York caselaw concerning parole and probation searches sets out the general principal that, "in any evaluation of the reasonableness of a particular search or seizure the fact of defendant's status as a parolee [or probationer] is always relevant and may be critical; what may be unreasonable with respect to an individual who is not on parole [or probation] may be reasonable with respect to one who is."  People v. Huntley, 43 N.Y.2d 175, 181 (1977); People v. Suttell, 109 A.D.2d 249, 250 (4th Dep't 1985).  Nevertheless, even when the defendant challenging a probation search is not himself on probation, New York courts have denied suppression where a court has issued a probation search order and there was reasonable cause to believe that the probationer had violated the conditions of his probation.  See People v. Houston, 130 A.D.3d 1501 (4th Dep't 2014) (finding

that the trial court properly denied suppression, without even holding a hearing, where the evidence against the defendant, who was not on probation, was seized pursuant to a probation search order in apartment defendant shared with the probationer and the probation officer had reasonable cause to believe probationer violated conditions of his probation).

Under federal law, the Supreme Court has held that a warrantless probation search "supported by reasonable suspicion and authorized by a condition of probation" is reasonable under the Fourth Amendment.  U.S. v. Knights, 534 U.S. 112, 122 (2001).

Here, there is not a reasonable probability that a motion to controvert the probation search order would have succeeded in ultimately suppressing the drugs seized from the lockbox found in the dining room or the evidence seized from Gayot's bedroom.  Accordingly, Gayot cannot show that:  (1) Flowers acted unreasonably by not taking further steps to seek suppression of the items seized pursuant to the probation search order; or (2) that Gayot was prejudiced by Flower's purported failure to challenge the probation search order and seek suppression of the evidence seized on the morning of February 25.  There is not a reasonable probability that a suppression motion concerning the probation search would have been successful.

The probation search order, which was approved by a judge, allowed law enforcement to enter the premises at 258 N. Greene Street to conduct a search seeking drugs and firearms pursuant

Case 2:19-cv-04657-JMA   Document 18   Filed 01/31/22   Page 31 of 47 PageID #: 8802

to C.P.L. § 450.50.[15]  Detective Rivera testified that Fortune's probation officer, Officer Martorell, had made observations during a home visit that indicated Fortune was likely in violation of the terms of his probation, including Martorell's observation of a gun cleaning kit in the home.[16]  (Dec. 15 Hr'g Tr. 20-21, June 6 Tr. 27-28.)  Thereafter, Officer Martorell obtained the probation search order to search the entire premises of 258 N. Greene Avenue from a court, as required by C.P.L. § 410.50(3).  During the search of the premises on February 25, 2014, incriminating items were recovered from Gayot's room and the dining room that constituted probable cause for his arrest.

---

[15]  On August 3, 2020 the Court denied Gayot's motion to compel that sought production of the signed probation search order and accompanying affidavit.  The Court denied this motion because, in determining whether the state courts' decisions were "contrary to, or involved an unreasonable application of, clearly established Federal law," 28 U.S.C. § 2255(d)(1), the Court is limited to the record that was before the state court that adjudicated the claim on the merits.  Cullen v. Pinholster, 563 U.S. 170, 181 (2011).  Here, "neither a signed copy of the order nor its underlying affidavit were ever made exhibits before the state courts."  (D.E. 12).  The state court record, however, contained the unsigned probation search order as well as certain representations by the prosecution concerning the signed probation order and the contents of the supporting affidavit.  The Court finds, based on the actual record that was before the state court, that Gayot has not established that the state courts' decisions were "contrary to, or involved an unreasonable application of, clearly established Federal law."  Accordingly, he is not entitled to additional discovery in this federal habeas proceeding.

Additionally, even apart from Cullen v. Pinholster, in a § 2254 petition, "discovery is only allowed if the district court, acting in its discretion, finds 'good cause' to allow it.  Gayot has not shown good cause as there is no indication in the state court record that Gayot ever specifically filed a request with the state courts for these documents in connection with his ineffective assistance claims.

[16] The supporting affidavit Martorell provided to the court to obtain the probation search order contained further details indicating that Fortune possessed a firearm and drugs:

> Prior to the execution of the search order, Probation Officer Martorell completed an affidavit in which he described how he developed information that the probationer (Fortune) possessed at least one handgun. He conducted a home visit at Fortune's residence where he discovered that the probationer possessed, was using, and possibly packaging drugs. Martorell also found fixed blades and a firearm cleaning kit. Fortune told Martorell that he had access to most areas of the residence.

> Probation Officer Martorell also learned from law enforcement that 258 N. Greene Ave. was a location where drug activity occurred and a resident of the home had recently been arrested for the possession of narcotics

(D.E. 13-8 at 88; see also D.E. 13-12 at 32.)

To the extent Gayot is arguing that he would have been able to attack the factual basis for the issuance of the probation search order, that argument is meritless.[17]  Nothing in the record before the state court suggests that Gayot could have successfully challenged the factual basis for the probation search order or would have even received a hearing on such an argument.  Notably, Gayot never submitted any evidence in state court denying the factual bases for the issuance of the probation search order—including Fortune's possession of a gun cleaning kit and Fortune's access in the house.

Gayot also contends that he had a reasonable expectation of privacy in his bedroom that precluded the search of his bedroom,  Gayot suggests that if Flowers had challenged the probation search on this basis, the evidence seized from his bedroom would have been suppressed.  Through the lens of double deference, Flowers did not act unreasonably in not pursuing this argument and there was also not a reasonable probability that this argument would have been successful.  The state court's resolution of those issues was certainly not an unreasonable application of Strickland.  First, although Gayot was not the probationer, the probation search order, which was approved by a judge, permitted law enforcement executing the search order to search the entire premises, including Gayot's bedroom, outbuildings, and vehicles parked on the property.  This was not a situation where a probation search was conducted without court authorization—here, a judge approved the probation search order.  Second, there is no caselaw supporting Gayot's argument that the evidence seized from Gayot's bedroom pursuant to this judicially approved search order would have been suppressed.  New York law caselaw generally recognizes that "what is reasonable

---

[17] As discussed supra, Gayot moved for discovery of the signed probation order and underlying affidavit.  To the extent that Gayot suggests that defense counsel should have argued that the probation search order was invalid because it was never actually approved by a judge, that argument is utterly speculative and without merit.  Further, any such argument is unexhausted as Gayot did not raise that argument in his claims before the state courts, and, as such, any such argument is procedurally barred.

in the case of a probationer or parolee may be unreasonable in the case of a person who is not under legal custody and continuing supervision"[18]  However, <u>People v. Houston</u>, 130 A.D.3d 1501 (4th Dep't 2015), a decision rendered shortly after the court's decision on Flowers' omnibus motion, appears to be the only state or federal decision addressing a challenge to a probation search order, issued under C.P.L. § 410.50(3), by a defendant who was not on probation.  And the Appellate Division in <u>Houston</u> affirmed the trial court's refusal to suppress the evidence seized in that search.  Third, there were important governmental interests here given that Fortune was suspected of illegally possessing a firearm and possessing and dealing drugs.[19]  Fourth, the record indicates that Fortune had access to other rooms in the house, and Gayot never argued that Fortune did not have access to Gayot's bedroom (or that the officers should have been aware of that fact) and never provided any proof on that issue in his state court filings.  Finally—although Flowers did not file a reply affirmation which specifically addressed the probation search order, viewing Flowers representation through the lens of double deference, his representation of Gayot met the requirements of <u>Strickland</u>.  Flowers alerted the court to suppression issues in his omnibus motion, requested a <u>Mapp</u> hearing, generally argued that the physical evidence recovered from Gayot should be suppressed, and ultimately obtained a <u>Mapp</u> hearing.  In light of <u>Houston</u> and all the other points above, it cannot be said that the state court decisions denying Gayot's appeal and § 440.10 motion unreasonably applied <u>Strickland</u>, which required Gayot to establish, <u>inter alia</u>, both that Flowers' conduct fell outside the "wide range of reasonable professional assistance" and

---

[18] <u>People v. Suttell</u>, 109 A.D.2d 249, 250 (1985).

[19] The record indicates that, during his probation visit, Martorell observed both a gun cleaning kit as well as drugs.

33

that there was a reasonable probability that this suppression argument would have been successful and that the outcome of the trial would have been different.[20]

With respect to the drugs recovered from inside the lockbox, all of the points set out above are similarly applicable to Gayot's arguments about the lockbox. Additionally, any possible privacy interest that Gayot had in his bedroom would not have extended to the common areas where the lockbox was found. Gayot's appellate brief mentioned, in passing, his alleged privacy interest in the lockbox and the fact that he did not consent to the search of the lockbox. However, Gayot's consent was not necessary as the lockbox was in the dining room—a common area that was clearly accessible to Fortune, the probationer. Additionally, there is no evidence that, prior to the officers seizing and opening the lockbox, Gayot or anyone else identified the lockbox as belonging to Gayot. Because the lockbox was in the dining room, there is not a reasonable probability the drugs seized from the lockbox would have been suppressed. See People v. Houston, 130 A.D.3d 1501 (4th Dept 2014). The cocaine and pills recovered from the lockbox would not have been suppressed—and their recovery in conjunction with Gayot's inculpatory statements to the officers about the contents of the lockbox—clearly established probable cause for his arrest on drug possession charges.

Finally, even assuming arguendo that some or all of the items seized from Gayot's bedroom would have been suppressed, Gayot cannot, given the other overwhelming evidence in the record,

---

[20] Even assuming arguendo that there was a reasonable probability that Gayot's alleged privacy interest in the bedroom would have precluded the prosecution from relying on the probation search order to justify the seizure of the evidence in his bedroom, suppression of some that evidence may have still been denied. Testimony at trial suggests that some of the items in Gayot's bedroom may have been in plain view of the officers who entered the bedroom as part of the initial protective sweep to find and secure all the occupants of the house. See Kentucky v. King, 563 U.S. 452, 463 (2011) (finding that police officers can seize evidence in plain view as long as they "have not violated the Fourth Amendment in arriving at the spot from which the observation of the evidence is made."); People v. Brown, 96 N.Y.2d 80, 88-89 (N.Y. 2001) (finding that, under the plain view doctrine, police may seize incriminating evidence in plain view during the execution of a search warrant, even if a portion of the search warrant is overbroad and later severed.); see June 3 Tr. 87–88 (testimony from Detective Rivera that he recovered drug paraphernalia including scales, a marijuana grinder, glass smoking pipe, and baggies from the TV stand in Gayot's bedroom and bulletproof vest in Gayot's closet).

establish that, absent counsel's purported errors, there is a reasonable probability that the outcome of the trial would have been different.  In addition to the drugs seized from the lockbox, there was other overwhelming evidence presented against Gayot at trial, including the testimony of all three victims, NN, GM, and NS, and photographs of the injuries caused by Gayot's assault of NS, which occurred only two days before the search.[21]  Upon entering the home and gathering the occupants into a common area, officers observed NS and NN as dirty and thin.  NN still bore the marks of that assault, including whip marks from the electrical cord and taser burns, as those injuries were observed and photographed at the hospital.  Additionally, NN was able to display the scars from that attack during her testimony at trial.  In addition to the testimony of the three women, which is set out at length in the background of this opinion, the prosecution introduced other corroborative evidence, most of which would not have been affected even if Gayot had been successful in suppressing some or all of the evidence seized in the probation search.

As such, Gayot is unable to show that there is a reasonable probability that without the evidence seized from his bedroom (or even without the evidence seized from the lockbox), that

---

[21]  As the State correctly asserted before the Appellate Division, even if all the evidence seized pursuant to the probation search order had been suppressed, that would not have affected the validity of the subsequent search warrants given the discovery by police of NS and NN during the search, and the fact that NS was a 15-year old runaway and NN had physical injuries.  The subsequent search warrants would still have valid under the inevitable discovery doctrine.

the outcome of the trial would have been different.[22]  Thus, Gayot cannot demonstrate prejudice to satisfy Strickland.

As such, Gayot is unable to demonstrate that the Appellate Division's decision was an unreasonable application of the Strickland standard.  Accordingly, his ineffective assistance of counsel claim is without merit and is denied.

### ii.  Attorney Brocato

Gayot next asserts that his second counsel, Christopher Brocato, deficiently performed at the pre-trial suppression hearing.  Specifically, petitioner claims that counsel's lack of familiarity with the facts surrounding the probation search order led to his failure to advocate for further inquiry into said order during the pre-trial suppression hearing.  (Pet. at 6.)

As an initial matter, Gayot must overcome "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance … [and] that, under the circumstances, the challenged action might be considered sound trial strategy."  Strickland, 466 U.S. at 689 (internal quotations and citation omitted).  Additionally, here, the record demonstrates

---

[22]  Additionally, even assuming arguendo that Gayot could establish that evidence from the bedroom and the lockbox would have been suppressed and that such suppression might have led to his acquittal on certain drug charges, habeas relief would still not be warranted here.  While some of the other seized evidence (along with Gayot's related inculpatory statements) helped bolster the case against Gayot, the evidence against him on the other counts, including the testimony of the three victims, was overwhelming.  Thus, even assuming that Gayot would have prevailed on his suppression arguments, his overall sentence would not be affected as he would still stand convicted of the other charges for which he received higher, concurrent, sentences.  As such, he cannot demonstrate prejudice under Strickland. Relatedly, it is appropriate to deny him habeas relief based the concurrent sentence doctrine.  Under the concurrent sentence doctrine, a court may deny habeas relief when a defendant is serving concurrent sentences, such that a ruling in the defendant's favor on certain convictions would not reduce the time he is required to serve or otherwise prejudice him in any way.  See Kassir v. United States, 3 F.4th 556, 561-62 (2d Cir. 2021).  Here, even if Gayot could establish that that he would have succeeded in suppressing all the evidence seized during the probation search from his bedroom and the lockbox, his overall sentence would not be affected because, at best, he would still stand convicted of the remainder of other charges for which he received higher concurrent sentences.  See McGough v. Lee, No. 17-CV-0847, 2019 WL2869438, at *8 (N.D.N.Y. July 3, 2019) (finding no prejudice where petitioner was sentenced to fifteen years imprisonment on each of five counts, to run concurrently, and counsel purportedly failed to call witness with potentially exculpatory evidence as to only two of five counts); see also Tavarez v. Larkin, 814 F.3d 644, 649 (2d Cir. 2016) (applying the concurrent sentence doctrine to § 2254 petition).

effective performance by counsel Brocato throughout the suppression hearing, and, in fact belies Gayot's claims that he was unfamiliar with the facts surrounding the probation search order.

At the outset, the prosecution outlined its view of the appropriate scope of the hearing as a Huntley, Wade, Dunaway hearing, to determine admissibility of Gayot's statements, identification, and probable cause, respectively.  (Dec. 15 Hr'g Tr. 2-3.)  The prosecutor also explained that the court order granting the hearing—which was issued before Brocato entered the case—also included a Mapp hearing to determine the admissibility of physical evidence to the extent that physical evidence was recovered after Gayot's arrest that was not recovered pursuant to a search warrant.  (Dec. 15 Hr'g Tr. 3.)  The prosecution further represented that there was no physical evidence recovered subsequent to Gayot's arrest that was not recovered pursuant to a search warrant.  (Dec. 15 Hr'g Tr. 3.)  Counsel Brocato nevertheless sought to inquire into the physical evidence that was recovered pursuant to the probation search order prior to Gayot's arrest.  (Dec. 15 Hr'g Tr. 4-5.)  The court, however, denied Brocato's motion.  (Dec. 5 Hr'g Tr. 6.)

Even after the court's adverse ruling on this issue, Brocato still attempted to cross-examine Detective Rivera regarding the circumstances of the probation search order, specifically inquiring into:  (1) how Fortune was in violation of his probation; (2) the fact Gayot was not on probation at the time of the search; (3) where the search order permitted law enforcement to search; and (4) whether Gayot was suspected of wrongdoing.  While the court permitted the aforementioned questioning, ultimately counsel was prevented from further questioning regarding the probation search order because the probation search order had never been controverted and the time to do so had expired.  (Dec. 15 Hr'g Tr. 49-51.)  Even so, Brocato's questioning demonstrated that he was not unfamiliar with the facts, as Gayot argues here.  Moreover, Brocato clearly attempted to explore these issues at the hearing and his attempts were ultimately rebuffed by the Court.  As

such, Gayot is unable to demonstrate that counsel's performance fell below the range of professional assistance.

Additionally, for the reasons set out <u>supra</u> in the discussion of Flowers, there is not a reasonable probability that any renewed motion by Brocato to controvert the probation search order and suppress the evidence recovered would ultimately have been unsuccessful. And, even if motion had succeeded, there was still overwhelming evidence against Gayot such that the outcome of the case would not have changed. Thus, Gayot is unable to show that, but for counsel's deficient performance, there was a reasonable probability that the outcome of the proceeding would have been different.

As such, Gayot is unable to demonstrate that the Appellate Division's finding that counsel was not ineffective is not contrary to, or an unreasonable application of, clearly established federal law.

### iii.  Attorney Russo

Last, Gayot contends that the representation by his trial counsel, Anthony Russo, was similarly ineffective due to counsel's failure to move to reopen the suppression hearing when additional facts came out at trial. (Pet. at 6.)

Gayot's petition is lacking further argument or articulation of what additional factors were revealed at trial to support his claim. In this claim on direct appeal, Gayot argued that Probation Officer Nichol's testimony regarding the pre-search briefing, which discussed a diagram that depicted and identified Gayot's room—combined with Detective Rivera's hearing testimony that there was suspicion that Fortune and Gayot were working together—was information Gayot could not have reasonably known and which demonstrated that the probation search order was used as a "subterfuge" search the house and Gayot's room. (App. Div. Br. at p. 47.) Gayot claimed he could

38

not have known this information prior to the determination of the pre-trial motion to suppress. Gayot's arguments in his state court filings on this point were poorly developed and did not even cite any specific caselaw in support of this "subterfuge" theory.

In People v. Huntley, 43 N.Y.2d 175, 181 (1977), the New York Court of Appeals explained that the reasonableness of a search of a parolee by a parole officer:

> turn[s] on whether the conduct of the parole officer was rationally and reasonably related to the performance of the parole officer's duty.  It would not be enough necessarily that there was some rational connection; the particular conduct must also have been substantially related to the performance of duty in the particular circumstances.

(Id.)  Some subsequent decisions by lower state courts indicate that "a parolee's status ought not to be exploited to allow a search which is designed solely to collect contraband or evidence in aid of the prosecution of an independent criminal investigation" and that "[w]hen the search is of such a nature, the parole officer becomes the conduit of the police officer in doing what the police officer could not do himself."  People v Candelaria, 63 A.D.2d 85 (1st Dep't 1978) (emphasis added).[23]  While suppression under this theory is conceivable, it is—not surprisingly—relatively rare.  Police officers are explicitly permitted to assist in executing a probation search order under C.P.L. § 410.50(5), and may do so even if the police have an independent suspicion that criminality is taking place, see People v. Reed, 150 A.D.3d 1655 (4th Dept 2017).

---

[23] Subsequent to Huntley, the Supreme Court held in 2001 that, under federal law, warrantless probation searches are permissible if the "officer has reasonable suspicion that a probationer subject to a [broad] search condition is engaged in criminal activity" and that there "is no basis for examining official purpose" in determining whether a probation search is permissible.  United States v. Knights, 534 U.S. 112, 121–22 (2001) (upholding search by regular detective of probationer's apartment where probationer had agreed to broad search condition).  And, the Second Circuit has, as a matter of federal law, rejected the "stalking horse" Gayot appears to espouse here.  See United States v. Reyes, 283 F.3d 446, 463 (2d Cir. 2002) ("Law enforcement officers are yoked with similar responsibilities to root out crime in the public at large.  Accordingly, the objectives and duties of probation officers and law enforcement personnel are unavoidably parallel and are frequently intertwined.  Indeed, it is difficult to imagine a situation where a probation officer conducting a home visit in conjunction with law enforcement officers, based on a tip that the probation officer has no reason to believe conveys intentionally false information about a supervisee's illegal activities, would not be pursuing legitimate supervised release objectives.").

As an initial matter, the only new information Gayot claims was revealed at trial was that law enforcement was aware that Gayot resided in the house and that they had marked off on a diagram of the house where his room was located.  This information alone was insufficient to re-open a suppression hearing under this theory.  Detective Rivera had previously testified at the pre-trial suppression hearing that there was suspicion that Gayot and Fortune were working together, which was information Gayot and his counsel were privy to prior to the determination of the motion to suppress.  Because Gayot was already aware, prior to trial, that there was suspicion that he was committing crimes with Fortune, a motion to re-open the hearing during trial would have been unsuccessful.

Additionally, Gayot's argument that the probation search order against Fortune was an improper subterfuge to gain access to the house and Gayot's room is unfounded.  Neither the testimony about the diagram at trial nor any the other evidence concerning the search in the record were red flags that should have alerted Russo or any other defense counsel that a suppression motion would likely have succeeded and should have been pursued under this "subterfuge" theory.  In fact, there was ample testimony at trial which shows that—even if defense counsel had requested and obtained a hearing—that this argument would have failed, whether it had been pursued prior to trial or had been raised in the midst of trial.

The testimony of Detective Rivera and other officers at trial defeat Gayot's "subterfuge"/"stalking horse" theory.  While a suppression hearing was not held, the involvement of the police and probation officers in the search and the procuring of the probation search order was still explored at trial.

Detective Rivera testified that he had no personal involvement with Fortune at any point, and that the matter was only brought to his attention a day or two before the actual search.  (June

6 Tr. 21-22.)  Additionally, Detective Rivera stated that he had previously heard the name Fortune, but prior to the day or two before the search Rivera had no other knowledge of Fortune and his gang involvement, and "wasn't involved in any investigation referenc[ing] Brandon Fortune." (June 6 Tr. 22.)  Rivera explained that Fortune was suspected of committing crimes as a result of Martorell's investigation and home visit, which occurred shortly before the probation search order was issued.  (June 6 Tr. 27–28.)  Rivera further stated that he did not go into depth prior to the search order, and just knew that Fortune was someone Officer Martorell was supervising as a probationer.  (June 6 Tr. 24-25.)  Prior to the probation search order, Fortune was not on Detective Rivera's "radar," and, to his knowledge, Fortune was not on anyone's "radar" in his office.  (June 6 Tr. 28-29.)  Detective Rivera also testified that Gayot was not "someone that the office was looking at" and that Rivera knew very little about him.  (June 6 Tr. 31.)  Detective Rivera also testified they searched the whole house because they did not know where Fortune may have kept anything and he had access to the whole house.  (June 6 Tr. 38.)

It is also notable that during the pre-search meeting—which was focused on Fortune—it was Probation Officer Martorell who:  (1) gave a briefing to the officers; (2) provided a handout with photographs of the three known occupants—Fortune, Gayot, and Allen; and (3) provided the officers with a sketch identifying the layout of the house.[24]  (June 1 Tr. at 20, 23,  25–28, 37–39; June 6 Tr. at 37.)

Similarly, Detectives Aquilino and Sneider—who took over this case after the probation search uncovered the drugs, gun, NS, and NN on the morning of February 25, 2014—testified that

---

[24]  This sketch is the diagram which indicated that the room on the first floor was Gayot's.  However, contrary to Gayot's suggestion, there was nothing nefarious about this diagram that supports Gayot's subterfuge theory and his claim that a suppression motion on this theory would have been likely to succeed.  As the prosecution explained in responding to Gayot's § 440.10 motion, the diagram at issue—which was introduced into evidence at trial— "identified the occupants of other rooms as well."  (ECF No. 12-13 at ECF p. 38; June 1 Tr. at 25–28.)

they only became involved in this investigation after the probation search order was executed and had no prior involvement with Gayot or Fortune.  (See June 9 Tr. 125, 162, 168 (testimony of Detective Sneider that:  (1) prior to being alerted about the results of the search, Detective Sneider was not working on this case; (2) he and Detective Aquilino became involved with this case after the search because whenever guns or drugs are recovered, his "unit from the first squad" is called; and (3) Detective Sneider had never been in contact with Gayot before and was "not really" familiar with Fortune and had never come into contact with him either); June 10 Tr. 58–75 (testimony of Detective Aquilino that:  (1) prior to Detective Rivera speaking to him on February 25, 2014 and informing him that narcotics had been recovered during the search, Detective Aquilino was not even aware that this house was being searched and had no previous involvement with this address during his work on the special operations narcotics team; (2) prior to February 25, 2014,  Detective Aquilino had "probably heard" Fortune's name from "General patrol," but he "had never dealt with him before" and did not know if he had been arrested).)

All of this testimony demonstrates that Officer Martorell's home visit led to the probation search order and that law enforcement was not using Officer Martorell as an improper conduit and subterfuge to search the home and Gayot's room.  The testimony above clearly undermines Gayot's subterfuge/stalking horse argument and, thus, Russo's representation of Gayot was not ineffective for failure to make this meritless motion.  Similarly, there is not a reasonable probability that this theory would have resulted in suppression if it had been advanced.[25]  See Schouenborg v.

_____

[25]  The testimony of all of these officers is also notable for other reasons.  First, these officers gave this testimony during trial, not during a suppression hearing.  Thus—unlike testimony at a suppression hearing—this is not an instance where the defense could credibly argue that the officers were trying to conform their testimony to avoid an adverse suppression ruling.  Second, the trial judge—who would have been the factfinder at any renewed suppression hearing—apparently found these officers credible at trial given her verdict at the conclusion of the bench trial.  Third, the same judge, in her written decision after the suppression hearing, also made factual findings based on the "credible evidence" adduced at the hearing, which included testimony given by Detectives Rivera and Aquilino—which further shows that the trial judge found those officers credible.

<u>Superintendent Auburn Corr. Facility</u>, 707 F. App'x 20, 23 (2d Cir. 2017) (denying ineffective assistance claim based on failure to request that <u>Wade</u> hearing be reopened based on trial testimony and stressing that"[g]iven the exceedingly deferential standard under which we review state court decisions in considering habeas petitions, we cannot conclude that the state court here unreasonably applied").

Gayot cannot demonstrate that if trial counsel had sought to re-open the suppression hearing, there is a reasonable probability that the outcome of the trial would have been different. As discussed <u>supra</u>, the information he argues was newly discovered at trial would not have warranted reopening the hearing.  Gayot also cannot demonstrate either that Russo acted unreasonably or that he was prejudiced because the testimony at trial indicates that there is not a reasonable probability that a suppression motion on this "subterfuge" theory would have been successful.

Thus, Gayot cannot demonstrate that the Appellate Division's decision was contrary to, or an unreasonable application of, clearly established federal law, and, as such, his claim is denied habeas relief.

### 2.  Fourth Amendment Claim

Gayot seeks habeas relief on the ground that his Fourth Amendment right to be free from unreasonable search and seizure was violated.  Specifically, Gayot argues that there was no probable cause for a search warrant against him, and that the probation search order was overly broad, and, as such, the search order was used to violate his Fourth Amendment rights.  (Pet. at 7.) For the following reasons, this claim is denied.

Gayot raised this claim on direct appeal.  The Appellate Division found that "this contention is unpreserved for appellate review because the defendant never moved for such

43

suppression." Gayot, 164 A.D.3d at 1259. As such, the state court "expressly relied on a procedural default as an independent and adequate state ground" in denying Gayot's unpreserved claim. Velasquez, 898 F.2d at 9. To overcome the procedural bar, Gayot must demonstrate: (1) "cause for the default and actual prejudice as a result of the alleged violation of federal law" or (2) "that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman, 750.

Gayot could satisfy the cause requirement by demonstrating that his attorney's failure to comply with state procedural rules denied him constitutionally adequate representation. Tavarez v. Larkin, 814 F.3d 644, 650 (2d Cir. 2016); Restrepo v. Kelly, 178 F.3d 634, 640 (2d Cir. 1999). Here, Gayot advances an ineffective assistance of counsel claim, wherein he argues that counsel was ineffective for failure to move to suppress the evidence obtained as a result of the probation search order. However, as discussed supra, Gayot's ineffective assistance of counsel claim fails, and, as such, he has not shown cause for the default and actual prejudice, or that failure to consider his Fourth Amendment claim will result in a fundamental miscarriage of justice. Thus, Gayot cannot overcome this procedural bar. And, even absent the procedural bar, Gayot's fourth claim is not cognizable on habeas review.

The Supreme Court has held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at trial." Stone v. Powell, 428 U.S. 465, 494-95 (1976). As long as the state provides the opportunity to litigate a petitioner's Fourth Amendment claim, it does not matter whether the petitioner "took advantage of the state's procedure." Graham v. Costello, 299 F.3d 129, 134 (2d Cir. 2002). In light of Stone v. Powell, a court may only address Fourth Amendment claims on

habeas review if: (1) the state has provided no corrective procedures at all to redress the Fourth Amendment violations; or (2) the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in that process.  Capellan v. Riley, 975 F.2d 67, 70 (2d Cir. 1992).

Here, Gayot does not argue that New York state failed to provide a corrective procedure to bring his alleged Fourth Amendment claim, and, as demonstrated by the record, a suppression hearing took place prior to trial, after which the hearing court issued a decision regarding the physical evidence seized.  (See generally Jan. 6, 2016 Hr'g Dec.)  To the extent that Gayot contends that he was denied a full and fair opportunity to litigate his Fourth Amendment claim because his counsel was allegedly ineffective in challenging the probation search order, his argument is insufficient to establish the sort of unconscionable breakdown necessary for the Court to address Gayot's Fourth Amendment claim.  See Shaw v. Scully, 654 F. Supp. 859, 865 (S.D.N.Y. 1987) ("Where petitioner have either taken advantage of an opportunity to present Fourth Amendment claims or deliberately bypassed the procedure . . . courts within this circuit have refused to equate ineffective assistance of counsel with unconscionable breakdown.") (citations omitted); see also Allah v. LeFevre, 623 F. Supp. 987, 991-92 (S.D.N.Y. 1985) (where the court rejected a habeas claim that ineffective assistance of counsel can constitute an "unconscionable breakdown," and found that "it is plain from the majority opinion in Gates v. Henderson, 568 F.2d 830 (2d Cir. 1977) that the Court of Appeals had something other than ineffective assistance of counsel in mind when it speculated that an unconscionable breakdown in state process might permit federal habeas review.").

Considering all the circumstances here, Gayot has not established an "unconscionable breakdown in that process" that would render Stone v. Powell's bar inapplicable.  See Cappiello

v. Hoke, 698 F. Supp. 1042, 1050 (E.D.N.Y.), aff'd, 852 F.2d 59 (2d Cir. 1988) ("[A]n unconscionable breakdown in the state's process must be one that calls into serious question whether a conviction is obtained pursuant to those fundamental notions of due process that are at the heart of a civilized society.").

As such, Gayot's Fourth Amendment claim is barred by Stone. Thus, habeas relief is not warranted based upon this claim.

### 3. Remaining Claims

Gayot only raised the two claims set out above in his habeas petition. In his reply brief, he references additional claims that he raised in his § 440.10 motion. Specifically, he references his claims involving: (1) allegedly newly disclosed evidence concerning Gorete Goncalves; and (2) alleged Brady and Rosario material relating to Detective Rivera and former police chief James Burke. Gayot waived these claims by waiting until this reply brief to raise them. In any event, these claims—as well as Gayot's additional ineffective assistance claims concerning matters other than the probation search order—are all patently meritless for the reasons set out in Judge Kahn's denial of Gayot's § 440.10 motion.

### III. CONCLUSION

Because the Court has considered all of Gayot's arguments and found them meritless, the petition is DENIED. A certificate of appealability shall not issue because Gayot has not made a substantial showing that he was denied any constitutional rights. See 28 U.S.C. § 2253(c)(2). I certify that any appeal of this Order would not be taken in good faith, and thus in forma pauperis status is denied for the purposes of any appeal. Coppedge v. United States, 369 U.S. 438, 444–45 (1962).

The Clerk of the Court is respectfully directed to mail a copy of this Order to petitioner and

to close the case.

**SO ORDERED.**

Dated:  January 31, 2022
Central Islip, New York

                                   _____/s/ (JMA)_____
                                   JOAN M. AZRACK
                                   UNITED STATES DISTRICT JUDGE